IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

──────────────────────────────

ROBERT L. MURRAY,

        Plaintiff,             Civil Action No.
                                     9:12-CV-1891 (LEK/DEP)

    v.

DR. GILLANI, *et al.*,

        Defendants.

──────────────────────────────

APPEARANCES:                       OF COUNSEL:

FOR PLAINTIFF:

ROBERT L. MURRAY
05-A-5765
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN     JOSHUA E. McMAHON, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Robert L. Murray, a New York State prison inmate, has filed this action against several individuals employed by either the New York State Office of Mental Health ("OMH") or New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging that the defendants deprived him of his civil rights. Although plaintiff's complaint, as amended, asserted several claims against the defendants, those that have survived initial review by the court are limited to an excessive force cause of action against four DOCCS corrections officers and two OMH nurses, all of whom remain unidentified, and a retaliation claim against an OMH psychiatrist and licensed psychiatric nurse practitioner.

Currently pending before the court is a summary judgment motion filed by the defendants seeking dismissal of plaintiff's remaining claims based either on plaintiff's failure to identify the individuals that allegedly assaulted him or the contention that the record evidence contains no genuine dispute of material fact with respect to whether the defendants unlawfully retaliated against him for engaging in protected activity.[1] For the

---

[1]    In their motion, defendants also seek dismissal of plaintiff's damage claims against them in their official capacities, based upon the Eleventh Amendment, and urge qualified immunity as an alternative ground for dismissal. Because I recommend dismissal of plaintiff's complaint on the merits, I have not addressed these two additional arguments.

2

reasons set forth below, I recommend that defendants' motion be granted.

I.    BACKGROUND[2]

Plaintiff is a prison inmate currently in the custody of the DOCCS.

*See generally* [Dkt. No. 7](). Although he is now confined elsewhere, at the

times relevant to the claims in this action, plaintiff was incarcerated in the

Clinton Correctional Facility ("Clinton"), located in Dannemora, New York.

*Id*. While at Clinton, plaintiff received mental health treatment for his

diagnosed anti-social personality disorder and mild mental retardation in a

---

[2]    Although plaintiff has opposed defendants' motion for summary judgment, he did not file an opposition to defendants' Local Rule 7.1(a)(3) Statement of Material Facts. *See generally* Dkt. Nos. 51, 52. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.). Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' Local Rule 7.1 Statement, Dkt. Nos. 49-40, 50, and he has failed to do so, I will deem defendants' facts contained in their Local Rule 7.1 Statement as having been admitted to the extent they are supported by accurate record citations. *See*, *e.g.*, *Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendants' Local Rule 7.1 Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

satellite unit of the Central New York Psychiatric Center ("CYNPC"), operated by the OMH and located within the facility. Dkt. No. 49-12 at 2. A Residential Crisis Treatment Program ("RCTP") operates within the CNYPC satellite unit and exists for purposes of admitting individuals with suicidal ideation or severe psychiatric decompensation. *Id.* at 4. Individuals are admitted to cells in the RCTP with appropriate safety precautions for observation and daily evaluation. *Id.*; Dkt. No. 49-26 at 2. At the times relevant to plaintiff's claims, he was treated by, *inter alia*, Dr. Sohail Gillani, an OMH licensed psychiatrist, and Travis Sawyer, an OMH psychiatrist nurse practitioner ("PNP"), both of whom were stationed at the CNYPC satellite unit. Dkt. No. 49-12 at 1, 5; Dkt. No. 49-26 at 1, 4.

According to plaintiff's amended complaint, on December 7, 2012, he was told by unidentified DOCCS corrections officers that staff in the OMH wanted to see him, and was escorted by the officers to the CNYPC satellite unit at Clinton. Dkt. No. 7 at 5-6. Plaintiff alleges that "one morning," on an unspecified date but presumably December 7, 2012, he was attacked by one unidentified DOCCS sergeant and four unidentified corrections officers. *Id.* at 6. The DOCCS officers allegedly handcuffed plaintiff, laid him on a bed inside his cell, elbowed him in the back, punched him in the face, and told him to shut up. *Id.* One of the officers allegedly placed pressure on plaintiff's Adam's apple and did not release until another officer intervened.

4

*Id.* According to plaintiff, he was forcibly medicated by two unidentified nurses during the attack. *Id.* at 6-7.

According to the evidence submitted by defendants in support of their motion, plaintiff was admitted to the RCTP for observation and stabilization on December 7, 2012. Dkt. No. 49-12 at 4-5; Dkt. No. 49-13; Dkt. No. 49-26 at 3; Dkt. No. 49-27. His admittance was prompted by plaintiff's report to an unidentified OMH staff member that his mind was racing and he believed defendant Gillani was tampering with his medications. Dkt. No. 49-13; Dkt. No. 49-27. The unidentified staff member reported in a written therapist progress note that, during a meeting with the plaintiff he could not make eye contact, his speech was rapid, and he was unable to report what he had eaten that day. *Id.* Upon admittance to the RCTP, a nurse noted plaintiff was "disheveled, rambling, [experiencing] paranoid ideation, incoherent, restless, [and] non-compliant [with] psych[iatric] medications." Dkt. No. 49-15 at 1; Dkt. No. 49-29 at 1.

Also on December 7, 2012, while plaintiff was admitted in the RCTP, defendant Gillani prescribed him an antipsychotic medication that can also be used to counteract agitation and aggression during an emergency situation. Dkt. No. 49-12 at 5; Dkt. No. 49-16 at 1. Plaintiff was administered the medication twice on that date without incident. Dkt. No. 49-12 at 5-6; Dkt. No. 49-17 at 1-2.

5

Plaintiff remained in the RCTP from December 7, 2012 through December 14, 2012, at which time he was discharged and returned to his regular cell at Clinton. Dkt. No. 49-23 at 2-3. Upon his discharge, plaintiff was prescribed three medications and scheduled for reassessment two weeks later. *Id.* at 3. During the period of his RCTP confinement, plaintiff was observed to be in various mental states, at times exhibiting agitation, accompanied by yelling and banging, and on occasion refusing meals and medications. *See generally* Dkt. Nos. 49-19 – 49-23.

II.  PROCEDURAL HISTORY

Plaintiff commenced this action on December 28, 2012, with the filing of a complaint and accompanying application to proceed in this action *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. He thereafter filed an amended complaint and IFP application on January 7, 2013. Dkt. Nos. 5, 7. In the currently operative amended complaint, plaintiff names Dr. Sohail Gillani and PNP Travis Sawyer as defendants, and also asserts claims against seven defendants as yet unidentified, including a DOCCS corrections sergeant, four DOCCS corrections officers, and two OMH nurses, all of whom are sued as "Doe" defendants. *See generally* Dkt. No. 7. Plaintiff's amended complaint asserts three causes of action against the defendants, including excessive force, interference with access to the courts, and cruel and unusual punishment. *Id.*

6

Following an initial review of plaintiff's amended complaint and IFP application, Senior District Judge Lawrence E. Kahn issued a decision on March 21, 2013, granting plaintiff IFP status, dismissing plaintiff's conditions of confinement and court access claims without prejudice, and denying plaintiff's motion for a preliminary injunction.[3] Dkt. No. 15.

On February 10, 2014, following the close of discovery, defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims. Dkt. No. 49. In their motion, defendants contend that (1) plaintiff's excessive force cause of action is subject to dismissal based upon his failure to identify the Doe defendants against whom the claim is asserted; (2) no reasonable factfinder could conclude, based on the record evidence, that a sufficient nexus exists between plaintiff's alleged protected conduct and defendants' alleged adverse action; (3) plaintiff's damage claims against the defendants in their official capacities are subject to dismissal based on Eleventh Amendment immunity; and (4) the named defendants are entitled to qualified immunity from suit. *See generally* Dkt. No. 49-2. In response, plaintiff has submitted nearly 200 pages of documents, including a single-page declaration stating that he was assaulted "by OBS staff on the orders of MHU staff" on May 16, 2013. Dkt. Nos. 51, 52. With limited exception, the documents submitted by plaintiff in opposition to the motion

---

[3] Plaintiff's second motion for a preliminary injunction was denied by decision and order issued by Judge Kahn on January 6, 2014. Dkt. No. 42.

do not relate to the claims in this case.[4] *See generally id.*

Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.  DISCUSSION

A.  Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553

---

[4]  More specifically, some of the documents relate to plaintiff's disciplinary proceedings arising from incidents occurring at Clinton in June and August 2013. Dkt. No. 51 at 2-82. Other documents relate to incidents occurring at Clinton in February and April 2013. *Id.* at 98-127. Although plaintiff submitted a one-page declaration complaining of an incident on May 16, 2013, none of the documents attached to the declaration relate to that incident. Dkt. No. 52 at 1. Instead, plaintiff attached a copy of his amended complaint, ten pages of documents related to the grievance he filed regarding the incident in the RCTP on December 7, 2012, and copies of case law. Dkt. No. 52 at 2-65.

(2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B.    Failure to Identify the Doe Defendants

Following an initial review of plaintiff's complaint, Senior District

Judge Kahn issued the following admonition to plaintiff in his order on

March 21, 2013:

> Plaintiff is advised that the United States Marshals Service cannot effect service on a 'Doe' defendant. In the event that Plaintiff wishes to pursue his claims against the John Doe and Jane Doe Defendants, he must take reasonable steps through discovery to ascertain the identities of these individuals. Upon learning the identity of a Doe Defendant, Plaintiff must further amend his Amended Complaint to name her properly as a defendant. If Plaintiff fails to ascertain the identity of any Doe Defendant so as to permit the timely service of process, this action will be dismissed against that individual.

Dkt. No. 15 at 8. Judge Kahn further directed "that Plaintiff take reasonable

steps to ascertain the identities of the 'John and Jane Doe' Defendants,

and when identified, seek to amend the Amended Complaint (Dkt. No. 7) to

add the individuals as defendants in this action pursuant to Rule 15(a) of

the Federal Rules of Civil Procedure[.]" *Id.* at 13. Defendants now argue

that plaintiff's failure to fulfill these requirements and to amend his

complaint and arrange for service of process upon the unidentified

defendants warrants dismissal of his claims against them. Dkt. No. 49-2 at

5-7.

Rule 4(m) of the Federal Rules of Civil Procedure requires that

service of a summons be effectuated within 120 days of its issuance, absent a court order extending that period.[5] Fed. R. Civ. P. 4(m). Upon a showing of good cause, this time for service must be extended. *See Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Panaras*, 94 F.3d at 340 (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("We hold that district courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *Zapata*, 502 F.3d at 197.

---

[5]     Rule 4(m) provides that,

> [i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. N.D.N.Y. L.R. 4.1(b).

In this case, despite being explicitly informed of his obligation to identify the Doe defendants, amend his complaint accordingly, and arrange for the issuance and service of summonses upon those defendants, plaintiff failed to do so. It is true that plaintiff appears to have made one attempt, by letter dated January 27, 2012, to obtain the necessary information from defendants' counsel. Dkt. No. 49-5. In response, defendants' counsel advised plaintiff that the information needed to discern the identities of those involved could be ascertained from the mandatory disclosures served upon plaintiff on December 31, 2013.[6] Dkt. No. 49-6. Throughout the course of discovery, which was originally scheduled to close on September 12, 2013, but was extended to December 30, 2013, plaintiff failed to elicit the court's assistance in obtaining the information necessary to ascertain the identities of the Doe defendants. Under these circumstances, I recommend that plaintiff's claims against the Doe defendants, which include a DOCCS sergeant, four DOCCS corrections officers, and two OMH nurses, be dismissed, without prejudice, based upon his failure to timely identify and serve those defendants. *See Mosley v. Woodly*, No. 11-CV-1490, 2013 WL 5347272, at *3 (N.D.N.Y. Sept. 23, 2013) (Hurd, J.,

---

[6]     Although I have been given no reason to doubt this assertion by counsel, because the court has not been provided with copies of the mandatory discovery materials forwarded to plaintiff pursuant to the court's Rule 16 order, I am unable to verify that the information necessary to identify the Doe defendants was included in those materials.

*adopting report and recommendation by* Treece, M.J.) (dismissing the "doe" defendant because the plaintiff failed to ascertain the identity of the defendant and serve him within the time periods allowed under either the local rules of practice for this court or the Federal Rules of Civil Procedure); *Thaxton v. Simmons*, No. 10-CV-1318 , 2013 WL 4806457, at *6 (N.D.N.Y. Sept. 9, 2013) (D'Agostino, J., *adopting report and recommendation by* Treece, M.J.) (same).[7]

     C.    <u>Sufficiency of Plaintiff's Retaliation Claim</u>

Liberally construed, plaintiff's amended complaint alleges that his admission into the RCTP on December 7, 2012, was in retaliation for his having previously filed a lawsuit against defendant Gillani and another OMH staff member at the facility. Dkt. No. 7 at 8. In their motion, defendants contend that no reasonable factfinder could conclude, based on the record evidence, that a nexus exists between plaintiff's admission to the RCTP and his earlier lawsuit. Dkt. No. 49-2 at 7-13

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000)

---

[7]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated," courts should "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Defendants concede, and I conclude, for purposes of the pending motion, that plaintiff has established that he engaged in protected activity, satisfying the first prong of the retaliation analysis. It is well settled that the filing of a lawsuit constitutes protected activity for purposes of a First

Amendment retaliation cause of action. *See, e.g., Colon*, 58 F.3d at 872 ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances."); *accord, Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

With respect to the second prong of the retaliation analysis, although defendants suggest that neither defendant Gillani nor defendant Sawyer were personally involved in admitting plaintiff to the RCTP, both defendants state in their declarations that "[a]dmittance to the RCTP is either approved by the psychiatrist, if present at the facility[,] or by the Chief of the Medical Health Unit, if no psychiatrist is available." Dkt. No. 49-26 at 2; *see also* Dkt. No. 49-12 at 4. Moreover, defendant Gillani states that, "[a]s the physician or nurse practitioner, admitting or discharging someone to the RCTP is not a prerogative. It is a decision in combined discussion between DOCCS, OMH nursing staff or a therapist." Dkt. No. 49-12 at 4. Because defendants Gillani and Sawyer, through their declarations, suggest that the decision to admit an inmate to the RCTP is a collaborative one that involves a discussion among all of the inmate's care providers, and because defendants Gillani and Sawyer were, at the relevant times, two of plaintiff's providers, I find that there is a dispute of material fact as to whether those defendants were involved in the decision to admit plaintiff to the RCTP. For purposes of this motion, I therefore assume, without

deciding, that admitting the plaintiff into the RCTP constituted adverse action. *See Morales v. Mackalm*, 278 F.3d 126, 131-32 (2d Cir. 2002), *abrogated on other grounds by Porter v. Nussle*, 534 U.S. 516, 532 (2002), (finding the allegation that the plaintiff was transferred to a psychiatric facility in retaliation for filing a grievance against the defendant "must be construed as describing an adverse action"); *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) ("[T]ransferring an inmate to another housing unit or to a psychiatric facility or assigning the inmate a less desirable work assignment satisfies the adverse action requirement.").

Turning now to the third element of a retaliation claim, causation, I find that no reasonable factfinder could conclude that the decision to admit plaintiff into the RCTP was motivated by his earlier lawsuit, filed against defendant Gillani. To establish the requisite connection between protected speech and adverse action, a plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord,* 343 F.3d at 133, 137 (2d Cir. 2003). In this case, there is no evidence, aside from plaintiff's vague and nearly indecipherable allegation in his amended complaint, that defendants Gillani and Sawyer admitted him to the RCTP because of the earlier lawsuit filed against defendant Gillani. Plaintiff's amended complaint alleges that (1) he "was told that Dr. Gillani and Sawyer and the Unit Chief put me up in

the OBS, and (2) "MHU STAFF is playing a lot of games with me Dr. Gillani [sic] after I file a lawsuit against him[.]" Dkt. No. 7 at 7, 8. Upon initial review of plaintiff's amended complaint, mindful of the court's obligation to liberally construe a *pro se* plaintiff's complaint, Senior District Judge Kahn permitted plaintiff's retaliation claim to proceed based on those allegations. Dkt. No. 15 at 7-8. At this stage in the proceedings, however, plaintiff's unsupported allegation contained in his amended complaint is not sufficient to give rise to a dispute of material fact regarding defendants' motivation for admitting him into the RCTP. Aside from plaintiff's allegation, all of the record evidence suggests that plaintiff was admitted into the RCTP on December 7, 2012, for legitimate reasons, including his diagnosis of anti-social personality disorder, coupled with his abnormal behavior observed by an OMH staff member at Clinton and his refusal to take his medication. Dkt. No. 49-12 at 2; Dkt. No. 49-13 at 1-2. In addition, the evidence demonstrates that while in the RCTP, plaintiff continued to exhibit abnormal and disruptive behavior and refused to eat or take prescribed medications. Dkt. Nos. 49-15, 49-17 – 49-20. Plaintiff's unsupported and vague allegation of retaliation is not sufficient to overcome all of this evidence. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their

17

reasons for the challenged actions, summary judgment dismissing the complaint may be granted[.]"); *Demaio v.Coughlin*, No. 89-CV-1237, 1994 WL 714537, at *3 (W.D.N.Y. Dec. 9, 1994) (granting summary judgment in favor of the defendants where the only evidence supporting the plaintiff's retaliation claim was the plaintiff's conclusory allegations in his amended complaint).

Accordingly, because I conclude that no reasonable factfinder could conclude, based on the record evidence, that defendants Gillani and Sawyer retaliated against plaintiff by admitting him into the RCTP in December 2012, I recommend that plaintiff's retaliation claim against those defendants be dismissed.[8]

IV.     SUMMARY AND RECOMMENDATION

The two remaining claims in this action assert causes of action for excessive force against unidentified Doe defendants, and for unlawful retaliation against the two named defendants. Plaintiff's claims against the Doe defendants are subject to dismissal based upon his failure to identify the defendants involved, amend his complaint, and arrange for service of

---

[8]     Even if a plaintiff carries the burden of establishing a *prima facie* case of retaliation, defendants may nonetheless avoid liability by proving, by a preponderance of the evidence, that they would have taken the same action against plaintiff even in the absence of protected conduct. *Mount Healthy City Sch. Dist. Educ.*, 429 U.S. at 287; *Dillan*, 497 F.3d at 255. I further find that, even if plaintiff were able to establish a *prima facie* case of retaliation, no reasonable factfinder could conclude, based on the record evidence, that defendants would not have taken the same action even absent retaliatory motivation.

process upon those defendants. Turning to the remaining retaliation claim against the two named defendants, I find that no reasonable factfinder could conclude that plaintiff's admission into the RCTP at Clinton on December 7, 2012, was motivated by retaliation for having filed an earlier lawsuit against defendant Gillani.

Based upon the foregoing it is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 49) be GRANTED, and that all remaining claims of the plaintiff in this action be dismissed, with prejudice as against defendants Gillani and Sawyer, and without prejudice with respect to the Doe defendants.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's

local rules.

Dated:     August 22, 2014
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge


Slip Copy, 2013 WL 5347272 (N.D.N.Y.)
**(Cite as: 2013 WL 5347272 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Tyshaun MOSLEY, Plaintiff,
v.
P. WOODLY,[FN1] Correction Captain, Clinton Correctional Facility; K. Mattot,[FN2] Correction Sergeant, Clinton Correctional Facility; P. Fessette, Correction Sergeant, Clinton Correctional Facility; M. Guynup, Correction Sergeant, Clinton Correctional Facility; W. Leclair, Correction Officer, Clinton Correctional Facility; John Doe, Correction Officer, Clinton Correctional Facility, Defendants.

> FN1. The correct spelling of this defendant's name is "Woodruff" and he will be referred to as such. The Clerk is directed to amend the caption accordingly.

> FN2. The correct spelling of this defendant's name is "Matott" and he will be referred to as such. The Clerk is directed to amend the caption accordingly.

No. 9:11–cv–1490.
Sept. 23, 2013.

Tyshaun Mosley, Albion, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Roger W. Kinsey, Esq., Ass't Attorney General, Albany, NY, for Defendants.

**DECISION and ORDER**
DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. § 1983. On August 29, 2013, the Honorable Randolph F. Treece, United States Magistrate Judge, advised by Report–Recommendation that defendants' motion for summary judgment be granted in part and denied in part. No objections to the

Report–Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. § 636(b)(1).

Therefore it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED as follows:

2. Plaintiff's deliberate medical indifference claim against defendants Matott, Fessette, Guynup, and LeClair are DISMISSED;

3. Plaintiff's due process claim against defendant Woodruff is DISMISSED;

4. Plaintiff's claims against all defendants in their official capacities are DISMISSED;

5. Defendants' motion for summary judgment is DENIED as to plaintiff's excessive force claim against defendant LeClair and DENIED as to plaintiff's failure to protect claim against defendants Matott, Fessette, and Guynup; and

6. Defendant John Doe is DISMISSED from this action as a result of plaintiff's failure to timely identify and serve him.

The Clerk is directed to serve a copy of this Decision and Order upon the parties in accordance with the Local Rules.

IT IS SO ORDERED.

TYSHAUN MOSLEY, Plaintiff,

—v—

P. WOODLY,[FN1] *Correction Captain, Clinton Correctional Facility,* K. MATTOT,[FN2] *Correc-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*tion Sergeant, Clinton Correctional Facility,* P. FESSETTE, *Correction Sergeant, Clinton Correctional Facility,* M. GUYNUP, *Correction Sergeant, Clinton Correctional Facility,* W. LECLAIR, *Correction Officer, Clinton Correctional Facility,* JOHN DOE, *Correction Officer, Clinton Correctional Facility,* Defendants.

> FN1. The correct spelling of this Defendant's name is "Woodruff" and the Court will reference him accordingly. Dkt. Nos. 14 & 23.

> FN2. The correct spelling of this Defendant's name is "Matott" and the Court will reference him accordingly. Dkt. Nos. 14 & 23.

### REPORT–RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Tyshaun Mosely brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants (1) used excessive force upon him, (2) failed to protect him from the use of excessive force, (3) were deliberately indifferent to his serious medical needs, and (4) deprived him of due process at a prison disciplinary hearing. *See generally* Dkt. No. 1, Compl.FN3 Defendants now move for Summary Judgment. Dkt. No. 23. Plaintiff opposes the Motion. Dkt. No. 29. For the reasons that follow, we recommend that Defendants' Motion be **GRANTED** in part, and **DENIED** in part.

> FN3. Plaintiff submitted a *pro forma* Complaint wherein he referred to an attached type written Complaint, both containing numbered paragraphs. *See* Dkt. No. 1. To avoid confusion we cite to the paragraphs enumerated in the Attached Complaint.

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [FED. R. CIV. P. 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5347272 (N.D.N.Y.)
**(Cite as: 2013 WL 5347272 (N.D.N.Y.))**

stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v.. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION
### A. Background

Except where noted, the following facts are undisputed.

On August 19, 2011, a fight involving dozens of inmates erupted in the main yard at Clinton Correctional Facility ("CCF"). Dkt. No. 23–1, Defs.' Statement Pursuant to Rule 7.1(a)(3) (hereinafter "Defs.' 7.1 Statement"), at ¶ 1. To regain control of the yard, correction officers fired multiple gunshots and ordered all inmates to lay down on the ground. *Id.* at ¶¶ 2 & 3. Officers then separated the inmates in the yard into three groups, those who were actively involved in or close to the fighting, those on the fringe of the fighting, and those who were not near the fighting but were in the yard. *Id.* at ¶¶ 3–6. [FN4] Defendants claim that Plaintiff was amongst those inmates that were involved in or very near to the fighting. *Id.* at ¶¶ 16 & 22. Plaintiff disputes this claim. *See* Dkt. No. 23–4, Michael Guynup Decl., dated Aug. 23, 2012, Ex. D, Disciplinary Hr'g Tr., dated Aug. 26, 2011, at pp. 14–17.

> FN4. Defendants have submitted surveillance footage depicting the melee in the yard, as well as the removal of inmates from the yard. *See, e.g.,* Dkt. No 23–4, Michael Guynup Decl., dated Aug. 23, 2012,

at Ex. A. However, the quality of the video is such that neither Plaintiff nor Defendants can be clearly identified, and thus is not helpful in resolving the parties' materially divergent factual accounts.

**\*3** After the melee ended, the inmates were removed from the yard and taken to the gymnasium where each inmate, including Plaintiff, was examined by the medical unit and photographed before being taken to their cells. Defs.' 7.1 Statement at ¶¶ 7–9. Plaintiff claims that while being transported from the main yard to the gymnasium, and while handcuffed behind his back, Defendants LeClair and Doe, "repeatedly punched and kicked [him] in the head, face and stomach." Compl. at ¶¶ 12–13. And that, once inside the gymnasium, in the presence of Defendants Matott, Fessette, and Guynup, "LeClair slapped [Plaintiff] across the face multiple times .... [and] several officers began punching and slapping [him] on the head and face. Others kicked [him] in the stomach and back." *Id.* at ¶¶ 14–16. Defendants deny that any such abuse occurred or that Defendants Matott, Fessette, or Guynup witnessed such abuse. *See e.g.* Defs.' 7.1 Statement at ¶¶ 12–13. Defendants also allege that Plaintiff neither reported any injuries, nor requested any medical attention after the incident. *Id.* at ¶¶ 10–11 & 14. Contrariwise, Plaintiff claims he suffered back pain as a result of the incident, but did not report it because he "was intimidated by the officials not to report any injuries ... to the medical staff." Compl. at ¶¶ 17 & 19.

Misbehavior reports were issued to those inmates involved in the fight, and Defendant Woodruff was temporarily assigned to CCF to conduct disciplinary hearings. Defs.' 7.1 Statement at ¶¶ 15, 17, & 19. After hearing the testimony of Defendant Sgt. Guynup and viewing the video of the melee, Plaintiff was found guilty and sentenced to eighteen-months confinement in a Special Housing Unit ("SHU") and a recommendation that he lose twelve-months [FN5] of good time credit. *Id.* at ¶¶ 24. Plaintiff was released from SHU sixty-seven

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

days later after the disciplinary decision was re-
versed on appeal and expunged. *Id.* at ¶¶ 25 & 26.

> FN5. There appears to be some confusion
> over he amount of good time credit
> Plaintiff lost as a result of the hearing.
> *Compare* Defs.' 7.1 Statement at ¶ 24, *with*
> Compl. at ¶ 27. However, it is clear from
> the transcript of Plaintiff's disciplinary
> hearing that the recommendation was for
> the loss of twelve-months of good time
> credit. Guynup Decl., Ex. D, Disciplinary
> Hr'g Tr. at p. 23.

### B. John Doe

Plaintiff named a John Doe Defendant in his
Complaint. *See generally* Compl. However, to date,
and despite being reminded by this Court,[FN6]
Plaintiff has failed to ascertain the true identify of
the Doe Defendant. Under FED. R. CIV. P. 4(c)(1)
and 4(m), the plaintiff is responsible for service of
the summons and complaint for each defendant
within 120 days of the filing of the complaint.[FN7]
Failure to properly serve any defendant in accord-
ance with the Federal Rules will result in the court,
upon motion or on its own initiative, to dismiss the
case without prejudice as to that defendant. *Id.* at
4(m). Here, Plaintiff had 120–days from December
10, 2011—the day he filed his Complaint—or, until
April 9, 2012, to timely name and serve the Doe
Defendant. Given Plaintiff's failure to do so, we re-
commend that the Doe Defendant be **DISMISSED.**

> FN6. On January 27, 2012, this Court spe-
> cifically reminded Plaintiff of his obliga-
> tion to ascertain the true identity of, and
> serve the Doe Defendant Dkt. No. 6, Dec.
> and Order, dated Jan. 27, 2012, at p. 2.

> FN7. Under the Local Rules for the North-
> ern District of New York, a plaintiff must
> effectuate service within sixty (60) days.
> N.D.N.Y.L .R. 4.1(b)

### C. Deliberate Medical Indifference

Plaintiff alleges that Defendants Matott, Fes-
sette, Guynup, and LeClair denied him access to
medical care in violation of the Eighth Amendment.
Compl. at ¶ 34. Defendants argue that Plaintiff has
failed to state an Eighth Amendment medical indif-
ference claim because he has not alleged a suffi-
ciently serious underlying medical condition. Defs.'
Mem. of Law at pp. 9–10. We agree, and therefore,
we recommend that Defendants' Motion be **GRAN-
TED** as to this claim.

**\*4** To state a claim for denial of medical care, a
prisoner must demonstrate (1) a serious medical
condition and (2) deliberate indifference. *Farmer
v. Brennan,* 511 U.S. 825, 834–35 (1994); *Hath-
away v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66
(2d Cir.1994). The first prong is an objective stand-
ard and considers whether the medical condition is
sufficiently serious. The Second Circuit has stated
that a medical need is serious if it presents "a con-
dition of urgency that may result in degeneration or
extreme pain ." *Chance v. Armstrong,* 143 F.3d
698, 702 (2d Cir.1998) (internal quotation marks
and citation omitted). Among the relevant factors to
consider are "[t]he existence of an injury that a
reasonable doctor or patient would find important
and worthy of comment or treatment; the presence
of a medical condition that significantly affects an
individuals' daily activities; or the existence of
chronic and substantial pain." *Chance v. Arm-
strong,* 143 F.3d at 702 (quoting *McGuckin v.
Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)).
The second prong is a subjective standard requiring
a plaintiff to demonstrate that the defendant acted
with the requisite culpable mental state similar to
that of criminal recklessness. *Wilson v. Seiter,* 501
U.S. 294, 301–03 (1991); *Hathaway I,* 37 F.3d at
66. A plaintiff must demonstrate that the defendant
acted with reckless disregard to a known substantial
risk of harm. *Farmer v. Brennan,* 511 U.S. at 836.
This requires "something more than mere negli-
gence ... [but] something less than acts or omissions
for the very purpose of causing harm or with know-
ledge that harm will result." *Id.* at 835; *see also
Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)
(citing *Farmer v. Brennan* ). "[T]he plaintiff must

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 105–06 (1976)).

Here, Petitioner claims that since the time of the alleged assault he has suffered "back pains." Compl. at ¶ 17. Courts have found chronic, debilitating back pain to be a serious injury for Eighth Amendment purposes. *See Jordan v. Rabinowitz,* 2010 WL 4810229, at *6 (N.D.N.Y. Aug. 24, 2010) (collecting cases for the proposition that severe long-lasting back pain constitutes a serious medical need); *see also Rodriguez v. Smith,* 2011 WL 4479689, at *5 (N.D.N.Y. Aug. 19, 2011) (collecting cases). However, unlike the plaintiffs in those cases, Mosely's complaints are unaccompanied by any medical diagnosis of a degenerative or chronic spinal condition, history of complaints of pain and suffering, or allegations that his condition has, in any meaningful way, interfered with his ability to go about his daily activities. *See Chance v. Armstrong,* 143 F.3d at 702. Thus, Plaintiff's "back pains" are not sufficiently serious for purposes of an Eighth Amendment medical indifference claim.[FN8] Therefore, we recommend that Defendants' Motion be **GRANTED** as to this claim.

> FN8. Plaintiff maintains that there is no medical diagnosis or history of complaints regarding his back pain because he was "intimidated by the officials" not to report any pain or injury. *Id.* at ¶ 19. In addition to the fact that Plaintiff fails to name the "officials" that allegedly intimidated him, or describe the form or manner of the intimidation, here, even if Plaintiff had reported his "back pains," the outcome would have been the same because such an injury is not sufficiently serious for purposes of the Eighth Amendment. Additionally, Plaintiff also claims that he was

denied a sick call request on August 20, 2011. Dkt. No. 29, Pl.'s Decl. in Opp'n, dated Nov. 18, 2012, at ¶ 13. However, once again, Plaintiff does not allege who he filed the request with, or that one of the named Defendants was responsible for denying it. Genuine issues of material fact are not raised by such vague and conclusory allegations. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### D. Excessive Force

**\*5** Plaintiff next claims that Defendant LeClair used excessive force against him. Compl. at ¶ 32. Defendants argue, *inter alia,* that Plaintiff has failed to state a cause of action because his injuries are not sufficiently serious. Dkt. No. 23–2, Defs.' Mem. of Law, at pp. 6–10. We disagree and therefore recommend Defendants' Motion be **DENIED** as to this claim.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666–67 (1962) (cited in *Tramell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003)). In *Hudson v. McMillian,* 503 U.S. 1 (1992), the Supreme Court clarified the standards for determining whether an Eighth Amendment violation occurred in the context of excessive force. Specifically, the Court stated that, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley [v. Albers,* 475 U.S. 312 (1986) ]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6–7 (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5347272 (N.D.N.Y.)
**(Cite as: 2013 WL 5347272 (N.D.N.Y.))**

acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks and citations omitted).

Regarding the objective element, we note initially that "a *de minim is* use of force will rarely suffice to state a constitutional claim[.]" *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). In that respect, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (quoted in *Hudson v. McMillian,* 503 U.S. at 10). However, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per se* because in such instances "contemporary standards of decency always are violated." *Blyden v. Mancusi,* 186 F.3d at 263 (citing *Hudson v. McMillian,* 503 U.S. at 9). For example, "when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs." *Beckford v. Portuondo,* 151 F.Supp.2d 204, 216 (N.D.N.Y.2001) (citation omitted).

With regard to the subjective component, a court should consider whether the defendant had a wanton state of mind when engaging in the alleged misconduct. To determine whether a defendant acted wantonly or maliciously, several factors should be examined, including

> **\*6** the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by defendants to temper the severity of a forceful response.

*Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted); *see also Hudson v. McMillian,* 503 U.S. at 7).

Although we agree with Defendants that Plaintiff's alleged injury, "back pains," appears to be *de minimis,* our inquiry does not end there. Although the court should consider the seriousness of the injury in assessing the objective element, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury;" thus, "the seriousness of the injury is relevant to the Eight Amendment inquiry, but does not end it." *Davidson v. Flynn,* 32 F.3d at 29–30 n. 1 (alterations in original) (quoting *Hudson v. McMillian,* 503 U.S. at 4). Moreover, if Plaintiff's claims that he was kicked, punched, and slapped in the face, stomach, head, and back while handcuffed behind his back and not presenting any particular threat to Defendant LeClair are found credible, a reasonable juror could conclude that the application of force in this case was not made in a good faith effort to maintain control or restore order, but rather with the sole purpose of causing harm. *See Hudson v. McMillian,* 503 U.S. at 6–7). Accordingly, because issues of material fact remain as to whether or not such acts did indeed occur, we recommend that Defendants' Motion be **DENIED.**

### E. Failure to Protect

Plaintiff further claims that Defendants Matott, Fessette, and Guynup, were present when such force was used, yet none of these Defendants intervened on Plaintiff's behalf. Compl. at ¶¶ 14–16 & 33. Defendants argue that these officers were neither present in the gymnasium nor witnessed any such abuse. Defs.' Mem. of Law at p. 11. For the reasons that follow we recommend that Defendants' Motion be **DENIED.**

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. at 832–33); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) ("Prison officials have a constitutional duty to act reasonably to ensure a safe envir-

onment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner."); *see also Avincola v. New York State Dep't of Corr. Servs.,* 1998 WL 146280, at \*3 (N.D.N.Y. Mar. 27, 1998).

In order to state such a claim based upon the failure to protect, a prisoner must demonstrate that prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him." *Hendricks v. Coughlin,* 942 F.2d at 113. A showing of mere negligence on behalf of the defendants is not enough to state a constitutional claim. *Whitley v. Albers,* 475 U.S. at 319 (cited in *Hendricks v. Coughlin,* 942 F.2d at 113). The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm, not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. at 836. To prove deliberate indifference, the plaintiff must show that the "official [knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at \*2 (N.D.N.Y. Mar. 24, 1998)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis added).

**\*7** Further, a supervisor can be held liable when he or she has actual or constructive notice of unconstitutional practices, but similarly acted with gross negligence or deliberate indifference in failing to act. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989). "Such a supervisor may not escape the consequences of his or her failure to act by pleading the doctrine of qualified immunity." *Fossett v. Morris,* 1991 WL 67093, at \*3 (S.D.N.Y. Apr. 22, 1991).

If Plaintiff's allegations that he was repeatedly struck by corrections officers in the presence of Defendants Matott, Fessette, and Guynup are accepted as true, a reasonable juror could conclude that these Defendants had both the opportunity and the obligation to intervene on Plaintiff's behalf, and, that

they failed to do so. *See Farmer v. Brennan,* 511 U.S. at 836–37. Defendants' claims that they were not present for and did not witness any alleged abuse are insufficient to warrant summary judgment; here Defendants offer only their own hearsay statements and the incident reports they prepared themselves to support their claims.[FN9] *See, e.g.,* Guynup Decl. at ¶¶ 20–23, 26, & Exs. A & B; Dkt. No 23–8, Paul Fessette Decl., dated Aug. 23, 2012, at ¶¶ 17–20 & 23. Thus, genuine issues of material fact exist regarding whether these Defendants were present in the gymnasium while Plaintiff was allegedly repeatedly struck by other corrections officers. Therefore, we recommend that Defendants' Motion be **DENIED** as to this claim.

> FN9. Moreover, at least with regards to Defendants' claim that Defendant Matott was never in the gym, the record evidence suggests otherwise. In a signed incident report prepared by Defendant Matott, he states "after most Inmates on the flats area were taken to the gym I went to the gym." Dkt. No. 23–4, Ex. B, at pp. 68–69, Lt–Mem., dated Aug. 19, 2011.

### F. Due Process

Plaintiff alleges that he was deprived of due process at his disciplinary hearing and, as a result, wasunfairly convicted and given eighteen-months confinement in SHU and a recommended loss of twelve-months of good time credit. Compl. at ¶ 35. Defendants argue that Plaintiff had no discernable liberty interest and thus has failed to state a due process claim. Defs.' Mem. of Law at pp. 12–15. We agree, and therefore, we recommend that Defendants' Motion be **GRANTED** as to this claim.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't*

*of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983) ), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. at 478.

**\*8** Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin v. Connor* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule re-

garding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted).

Here, Plaintiff was sentenced to serve eighteen-months in SHU and it was recommended that he lose twelve-months of good time credit. Disciplinary Hr'g Tr. at p. 23. However, Plaintiff's conviction was later overturned on appeal and Plaintiff was released from SHU after serving only sixty-seven days. Dkt. No. 29, Tyshaun Mosely Decl., dated Nov. 18, 2012, at ¶¶ 18 & 19. The Second Circuit has held that it is the length of the *actual* punishment that is relevant in determining whether a period of SHU confinement implicates a cognizable liberty interest, and, not the length of the sentence imposed. *Scott v. Albury,* 156 F.3d 283, 287–88 (2d Cir.1998) ("No right to due process is implicated in the prison context *unless* a liberty interest has been deprived, and we read *Sandin [v. Conner]* to require that we look to actual punishment in making this determination."). Therefore, the relevant period of confinement for the purposes of our analysis is the sixty-seven days Plaintiff spent in SHU, and not the eighteen-months he was sentenced to by Defendant Woodruff.

Despite the fact that no bright-line rule exists, courts within the Second Circuit have repeatedly found that periods of SHU confinement under **normal conditions** "lasting fewer than 101 days have been found not to amount to [an] atypical and significant hardship." *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 606 (S.D.N.Y.2009) (citing *Sealy v. Giltner,* 197 F.3d 578, 588–90 (2d Cir.1999)); *see also Edmonson v. Coughlin,* 1996 WL 622626, at \*4–5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Alvarado v. Kerrigan,* 152 F.Supp.2d 350, 355 (S.D.N.Y.2001) (93 days) (citing *Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y. July

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

28, 2000) (75 days confinement); *Jackson v. Johnson,* 15 F.Supp.2d 341, 361–62 (S.D.N.Y.1998) (99 days); *Trice v. Clark,* 1996 WL 257578, at *3 (S.D.N.Y. May 16, 1996) (150 days)). That is not to say that any period of confinement that does not last longer than 101 days cannot be atypical. *See Palmer v. Richards,* 364 F .3d at 65 (noting that SHU confinements of less than 101 days could constitute atypical and significant hardships if the conditions were more severe than the "normal SHU conditions"). Here, the record is completely devoid of any evidence that the SHU conditions Plaintiff experienced during his sixty-seven day confinement differed from the ordinary incidents of prison life as experienced by other SHU or general population inmates. Thus, the sixty-seven days Plaintiff served in SHU did not implicate a cognizable liberty interest.

**\*9** Therefore, we recommend that Defendants' Motion be **GRANTED** as to this claim.

### G. Eleventh Amendment Immunity

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Neg-*

*ron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540.

Here, Plaintiff has not requested any injunctive relief against the individual Defendants in their personal or official capacities. Therefore, because Plaintiff has requested only monetary relief, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's claims against Defendants in their official capacities.

### H. Qualified Immunity

**\*10** Defendants claim that Defendant Woodruff is entitled to qualified immunity for his role as hearing officer at Plaintiff's disciplinary hearing. However, as we have found no due process violation, we need not, and do not, consider this argument. *See supra* Part II.F.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 23) be **GRANTED** in part, and **DENIED** in part, as follows:

1. **DENIED** as to Plaintiff's excessive force claim against Defendant LeClair;

2. **DENIED** as to Plaintiff's failure to protect claim against Defendants Matott, Fessette, and Guynup;

3. **GRANTED** as to Plaintiff's deliberate medical indifference claim against Defendants Matott, Fessette, Guynup, and LeClair;

4. **GRANTED** as to Plaintiff's due process claim against Defendant Woodruff;

5. **GRANTED** as to Plaintiff's claims against Defendants in their official capacities; and it is further

**RECOMMENDED,** that Defendant John Doe be **DISMISSED** from this action as a result of Plaintiff's failure to timely identify and serve him; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

N.D.N.Y.,2013.

Mosley v. Woodly
Slip Copy, 2013 WL 5347272 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 360141 (N.D.N.Y.)

(Cite as: 2012 WL 360141 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronnie THAXTON, Plaintiff,
v.
A. SIMMONS, Corrections Officer, Upstate
Correctional Facility; Gary, Corrections Officer, Upstate
Correctional Facility; Bush, Corrections Officer,
Upstate Correctional Facility; John Doe, Corrections
Officer, Upstate Correctional Facility; K. Garneau,
Nurse, Upstate Correctional Facility; and Lumbard,
Upstate Correctional Facility, Defendants.
No. 9:10–cv–1318 (MAD/RFT).

Feb. 2, 2012.
**ORDER**

Ronnie Thaxton, Comstock, NY, pro se.

Office of the New York State Attorney General, Christopher W. Hall, AAG, of Counsel, Albany, NY, for Defendants.

MAE A. D'AGOSTINO, District Judge.

*1 In a complaint dated October 31, 2010, Plaintiff *pro se* alleges that Defendants violated his constitutional rights while he was incarcerated at Upstate Correctional Facility. *See* Dkt. No. 1. Currently before the Court is Magistrate Judge Treece's January 5, 2012 Report–Recommendation and Order, in which he recommends granting in part and denying in part Defendants' motion to dismiss. *See* Dkt. No. 31.

In his complaint, Plaintiff alleges that, on or about January 13, 2009, he filed an inmate grievance against Defendant Simmons, whom Plaintiff claims harassed him and denied him food at dinner. *See* Dkt. No. 1 at 6.[FN1] Approximately three-months later, on April 6, 2009, Plaintiffs asked Defendants Simmons and Gary for another food tray because there was hair all over the one he had

received. *See id.* After receiving another tray, Plaintiff asked Defendant Simmons why there was an issue with his food each time that Defendant Simmons worked. *See id.* Defendant Simmons responded that did not have time to play with Plaintiff's food, but Plaintiff would know if he had played with it. *See id.* Defendant Gary added that he could accommodate Plaintiff by putting something in his food. *See id.* Plaintiff took both of these comments as threats.

> FN1. On March 29, 2011, Judge Sharpe issued a Memorandum–Decision and Order in which he dismissed the claims against Defendants Duvall, Bellnier, and Bellamy without prejudice. *See* Dkt. No. 6 at 10. Plaintiff never amended him complaint to reassert his claims against these Defendants. As such, the Court will only address the facts contained in the complaint relevant to the remaining Defendants and claims.

On April 7, 2009, the following day, Defendant Gary made more comments to Plaintiff about his food while serving him dinner. Plaintiff refused to eat out of fear that his food had been tampered with. *See id.* On April 9, 2009, Plaintiff filed an inmate grievance regarding these incidents. *See id.*

On April 28, 2009, Plaintiff was served a kosher dinner by Defendants Bush and Doe. *See id.* at 8. After putting his sardine sandwich together, Plaintiff took a few bites, felt a sharp pain and grinding in his mouth, and immediately spit out the food. *See id.* In the food that he spit out, Plaintiff noticed a gold colored piece of metal and that there were drops of blood. *See id* . Plaintiff immediately called for medical attention and Defendant Bush responded by promptly notifying Defendants Lumbard and Garneau. *See id.* Upon Defendants Lumbard and Garneau's arrival, Plaintiff told them what had occurred. *See id.* At this point, Defendant Garneau gave Plaintiff a medical incident form to fill out and Defendant Lumbard took possession of the piece of metal and placed it in a ziplock bag to be photographed and placed on file. *See id.* Plaintiff then asked Defendant Garneau to examine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 360141 (N.D.N.Y.)

(Cite as: 2012 WL 360141 (N.D.N.Y.))

him, to which she responded that there was not much damage. *See id.* Plaintiff further emphasized that he was cut and was in pain, at which point Defendant Garneau walked off stating "don't be a cry baby." *See id.* at 9.

In his January 5, 2012 Report–Recommendation and Order, Magistrate Judge Treece recommended that the Court grant in part and deny in part Defendants' motion to dismiss. *See* Dkt. No. 31. Specifically, Magistrate Judge Treece recommended that the Court rule on Defendants' motion to dismiss as follows: (1) granted as to Plaintiffs' Eighth Amendment failure to protect claims against Defendant Bellnier, Duvall, and Bellamy, who were each previously dismissed from this action; (2) granted as to Plaintiff's claims of verbal harassment and threats against all Defendants; (3) granted as to Plaintiff's Eighth Amendment nutrition claims against Defendants Simmons and Gary; (4) denied as to Plaintiff's Eighth Amendment nutrition claims against Defendants Bush and Doe; (5) denied as to Plaintiff's Eighth Amendment deliberate medical indifference claims against Defendant Garneau; (6) granted as to Plaintiff's First Amendment interference with religion claims against all Defendants; (7) granted as to Plaintiff's conspiracy claims against all Defendants; (8) denied as to Plaintiff's First Amendment retaliation claim against Defendant Simmons; and (9) granted as to Plaintiff's First Amendment retaliation claims against Defendants Bush and Doe. *See id.* at 9. Plaintiff did not object to Magistrate Judge Treece's Report–Recommendation and Order.

**\*2** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

Having reviewed Magistrate Judge Treece's January 5, 2012 Report–Recommendation and Order and the applicable law, the Court finds that Magistrate Judge Treece correctly recommended that the Court should grant in part and deny in part Defendants' motion to dismiss as set forth above.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Treece's January 5, 2012 Report–Recommendation and Order is **ACCEPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion to dismiss is **GRANTED in part and DENIED in part** for the reasons set forth in Magistrate Judge Treece's Report–Recommendation and Order; and the Court further

**ORDERS** that Defendants Simmons, Bush, Doe, and Garneau shall file an answer in response to the remaining claims in the complaint; and the Court further

**ORDERS** that Plaintiff shall continue to take steps to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 360141 (N.D.N.Y.)

(Cite as: 2012 WL 360141 (N.D.N.Y.))

ascertain the identity of Defendant John Doe; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Treece for all further pretrial matters; and the Court further

**\*3 ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.

Thaxton v. Simmons
Slip Copy, 2012 WL 360141 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.

I. *Introduction* [FN2]

> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> [FN7.] The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U.S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).* Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)
**(Cite as: 1994 WL 714537 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, W.D. New York.
Frank DEMAIO, Plaintiff,
v.
Thomas COUGHLIN, III, Walter Kelly, J. Kihl,
Capt. Henneberg, John Glassheen, Carl Steinvall,
W. Stranahan, K. Countermine, S.F. Martin, D.
Bates, Shu Officer Booker, Sgt. Falcone and Con-
nie Mills, Defendants.

No. 89–CV–1237E(M).
Dec. 9, 1994.

Frank Demaio, pro se.

Asst. Atty. Gen. Gail Y. Mitchell, Buffalo, NY, for
defendants.

MEMORANDUM AND ORDER

ELFVIN, District Judge.

*1 The plaintiff, a prison inmate proceeding
*pro se,* brought this action pursuant to 42 U.S.C. §
1983 alleging, *inter alia,* that the defendants were
deliberately indifferent to his safety and well-being
in violation of his Eighth Amendment right to be
free from cruel and unusual punishments. These al-
legations arise out of the plaintiff's transfer in 1989
to the Attica Correctional Facility ("Attica"), his
detention in the Special Housing Unit ("SHU")
there for nine and one-half months and his alleged
need for protective custody status. Before this
Court are the motions of defendants Coughlin,
Kelly, Kihl, Henneberg, Glassheen, Steinvall, Fal-
cone and Mills[FN1] for summary judgment pursu-
ant to FRCvP[FN2] 56(b). Also before this Court is
the plaintiff's cross-motion for summary judgment.
Such defendants' motions will be granted and the
plaintiff's motion will be denied.

The plaintiff has been an inmate in New York's
prison system under the aegis of the Department of
Correctional Services ("DOCS") since October

1986. He has maintained since being incarcerated
that, because he had "ripped off" most of the major
drug dealers on the East Coast, there was an "open
contract" on his life and that he therefore required
protective custody. While being held in a New
York City jail on the charges that led to his incar-
ceration by DOCS, the plaintiff slashed his wrist
when he was being forced to leave protective cus-
tody within the jail. *See* Plaintiff's Cross–Motion
for Summary Judgment, at Exh. B (report of At-
tica's "Committee for Protective Custody"). In Feb-
ruary 1987, while at the Fishkill Holding Center,
the plaintiff wrote to defendant Coughlin, the
Commissioner of DOCS, and set forth a list of the
DOCS facilities—including Attica and the Clinton
Correctional Facility ("Clinton")—to which he
should not be transferred because such allegedly
"would place plaintiff's life in immediate jeopardy
due to his enemies." Amended Complaint, at ¶ 1.
The plaintiff did not name such enemies or particu-
larize why they might be present in such facilities.
He contends that he does not know their names be-
cause "these drug dealers are well insulated and do
not make themselves known." *Id.* at Exh. A. There-
after, the plaintiff was transferred to Clinton, where
at an undetermined time he was put in voluntary
protective custody. Both he and members of his
family began sending to Coughlin and others a
series of requests for transfer because of the
plaintiff's "enemy situation." All were denied, the
reason given being that no other facility was avail-
able. *Id.* at ¶¶ 2–7. The plaintiff was transferred to
Attica August 25, 1989 and apparently was not put
into protective custody until fifteen days thereafter.
On or about October 4th, after he had threatened to
cut his wrists, he was moved from protective cus-
tody to a cell in Attica's Mental Health Observation
Unit, which is under the jurisdiction of New York's
Office of Mental Health. For safety reasons the ob-
servation unit cells are equipped with thin mat-
tresses and the inmates are issued no clothing other
than underwear. After it apparently was determined
that the plaintiff was feigning suicidal tendencies as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)
**(Cite as: 1994 WL 714537 (W.D.N.Y.))**

a way to stay within the unit, it was decided that he should be moved back to protective custody. Defendant Falcone came to plaintiff's cell October 12th and ordered him to leave the observation unit, but the plaintiff refused. Falcone then forcibly dragged him to the Special Housing Unit ("SHU") and reported him for the misbehavior. A Tier III disciplinary hearing ensued, the plaintiff was found guilty of disobeying a direct order and was sentenced to 30 days in the SHU. After his sentence had been served he disobeyed another direct order to leave the SHU, pleaded guilty to such at his November 15th disciplinary hearing (with the explanation that he refused voluntary protection status and general population status because he felt unsafe in either placement) and was sentenced to 60 more days in the SHU. This pattern repeated itself several more times until the plaintiff was transferred from Attica to Great Meadow Correctional Facility in May 1990.

**\*2** Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FRCvP 56(c). In making such a determination, a court must view the facts in the light most favorable to the non-movant and any doubts as to the existence of a genuine issue for trial should be resolved against the moving party. *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). The moving party bears the initial burden of establishing that no genuine issue as to a material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If, as here, the non-movant bears the burden of proof on a claim at trial, the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such claim. *Id.* at 325. Once the moving party has established its initial burden, the non-movant must set forth specific facts showing that there is a genuine and material issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Such a showing must consist of more than a "scintilla of evidence"; the non-movant must show that there is evidence from which a reasonable juror could re-

turn a verdict in his favor. *Id.* at 252. Thus, if the non-movant fails to make such a showing re any essential element of a claim, summary judgment against him on that claim is appropriate.

Turning to the allegations against Coughlin, the plaintiff contends that Coughlin was "deliberately indifferent" to his safety because he allowed the plaintiff to be transferred to Attica even though the plaintiff had told him that he had "enemies" there. An inmate has no constitutional right not to be transferred from one facility to another. *See Meachum v. Fano,* 427 U.S. 215, 225 (1976). While he does have a right to be protected from violence from other inmates— *see Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991)—, which might include the right not to be transferred to a prison where there is a known threat of death— *see Fitzharris v. Wolff,* 702 F.2d 836, 839 (9th Cir.1983)—, in order to be held liable for a failure to protect, an official must be shown to have demonstrated deliberate indifference to the inmate's safety. *See Hendricks v. Coughlin,* 942 F.2d at 109, 113. An official demonstrates deliberate indifference when he has actual or constructive notice of a specific risk to an inmate's safety and fails to take steps to protect the inmate from injury. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (1989). Beyond the fact that the plaintiff can point to no harm that resulted when he was transferred from Clinton to Attica (other than being "stressed out"), he has also adduced no probative proof that Coughlin knew of a *specific* risk that even *might* have befallen him as a result of such transfer. His mere speculations concerning unnamed "enemies" who might do him harm are insufficient because, given that all the facilities had available voluntary protective custody status, Coughlin and all the other cognizant prison officials had no rational basis to believe that one facility would be safer than another. That the plaintiff and others for him called or wrote to Coughlin's office dozens of times concerning these speculations does not make them any more specific. Further, Clinton itself, like Attica, was one of the facilities to which the plaintiff had

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)
**(Cite as: 1994 WL 714537 (W.D.N.Y.))**

originally demanded he not be sent. His safety needs having been met there, it was hardly unreasonable to believe that such needs could be met equally as well at Attica. For the same reasons, the plaintiff's claim that defendant Classification Analyst Glasheen was deliberately indifferent to his safety in allowing the transfer, will be dismissed, as will the claim against defendant Correction Counselor Mills that she lied to the plaintiff and his parents about the transfer and did nothing to stop it. FN3

**\*3** The plaintiff alleges that defendant Steinvall—a psychologist employed by the New York State Department of Mental Health who was assigned to Attica in October 1989—placed him in the Mental Health Observation Unit knowing that he was not mentally ill and in retaliation for the plaintiff's claimed need for protection. This claim is seriously undercut by the plaintiff's admission that he had threatened to cut his wrists, which strongly suggests that the decision to put him in the unit was an act of professional prudence. Regardless, the United States Court of Appeals for the Second Circuit has noted that prisoners' claims of retaliation are "prone to abuse." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Given this reality, *Flaherty* directs that

"[I]f the production of all relevant documents fails to add substance to the [prisoner's] allegations [of retaliation] and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted." *Ibid.*

Steinvall has submitted such an explanatory affidavit (sworn to August 24, 1992) and the plaintiff can point to nothing beyond the conclusory allegations in the Amended Complaint which even hints that retaliation motivated Steinvall's actions. The claim against him therefore will be dismissed.

The claim against defendant Kelly, Superintendent of Attica, fails because the Amended Complaint makes no allegation that he was personally involved in, had knowledge of, or acquiesced in the cited incidents. (In fact, the only mention of Kelly in the Amended Complaint is in its caption.) Even if, as here, a defendant is in a high position of authority, such allegations are necessary to support a cognizable section 1983 claim. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). Further, Kelly has submitted an affidavit (sworn to August 20, 1992) wherein he states he had no personal involvement in the matters alleged in the Amended Complaint. The claims against him therefore will be dismissed.

The plaintiff alleges that defendant Henneberg, who presided at two of the plaintiff's disciplinary hearings (on November 15, 1989 and January 8, 1990), denied him due process by not allowing him to answer the charges against him. Such allegation is meritless because the plaintiff admits to the charges that were the subject of the hearings—*i.e.,* his refusals to obey direct orders to leave the SHU—and admits that he refused to attend the hearings. Further, he never appealed Henneberg's decisions and thus never exhausted his administrative remedies, and he has offered no proof in response to the Henneberg's instant summary judgment motion to buttress the conclusory allegations in the Amended Complaint. The claims against Henneberg will therefore be dismissed.

The only allegation against defendant Falcone, a Correction Sergeant at Attica, is that he went to the Mental Health Observation Unit, ordered the plaintiff to go to protective custody and forcibly removed the plaintiff to the SHU after the plaintiff had refused his order. The plaintiff points to—and this Court knows of—no constitutional right of a prisoner to disobey a guard's order to move from one cell to another. Further, no damages are alleged to have occurred as a result of Falcone's actions, and the plaintiff again has offered only the bald allegations in the Amended Complaint. The claims against Falcone will therefore be dismissed.

**\*4** The claims against Kihl, the hearing officer who presided at the plaintiff's February 7, 1990 su-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)
**(Cite as: 1994 WL 714537 (W.D.N.Y.))**

perintendent's hearing, will be dismissed because, as this Court has previously ruled, Kihl is entitled to absolute immunity. *See Malinowski v. Kihl,* 91–CV–0301E (Memorandum and Order, signed August 23, 1993).

Accordingly, it is hereby *ORDERED* that the summary judgment motions of defendants Coughlin, Glasheen, Mills, Kelly, Kihl, Henneberg, Falcone and Steinvall are granted and the plaintiff's cross-motion for summary judgment is denied.

FN1. Defendants Countermine, Martin, Bates, Booker and Stranahan have not moved for summary judgment and thus this action remains open as to them.

FN2. Federal Rules of Civil Procedure.

FN3. The plaintiff has also made various additional allegations against Coughlin in a "Supplemental Complaint" filed July 27, 1993. These allegations are not properly before this Court because the plaintiff has never moved to amend his Complaint a second time. However, even if they were properly before this Court, they would be dismissed because they fail to implicate Coughlin's personal involvement in the wrongs therein alleged.

W.D.N.Y.,1994.
Demaio v. Coughlin
Not Reported in F.Supp., 1994 WL 714537 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

## BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See*Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *AccordDavis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. Id. Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.
### INTRODUCTION
**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States District Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.),* *af'd without op.,* 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995) (when a party makes no objection to
a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

> FN1. Local Rule 7.1(a)(3) provides:
>
> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*
>
> Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> **FN2.** While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at *5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt".[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

*5 The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of

clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

### CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.